ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2019-Apr-23  17:23:34
60CV-19-2768
C06D05 : 49 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
### _____ DIVISION

**HOME TO COMMUNITY LIVING, INC.,** on
**Behalf of itself and all others similarly situated.**                    **PLAINTIFFS**

**V.**                         **CASE NO. _____**

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,
CINDY GILLESPIE, IN HER OFFICIAL CAPACITY
AS DIRECTOR OF THE ARKANSAS DEPARTMENT
OF HUMAN SERVICES; AND PAULA STONE, IN HER
OFFICIAL CAPACITY AS DEPUTY DIRECTOR, INNOVATION
AND DELIVERY SYSTEM REFORM, APC PASSE, LLC
dba SUMMIT COMMUNITY CARE; EMPOWER HEALTHCARE
SOLUTIONS, LLC; and ARKANSAS TOTAL CARE, INC., and its Parent
Company of CENTENE CORPORATION; and OPTUM SERVICES, INC.,
a division of UNITED HEALTHCARE SERVICES, INC.**

                                   **DEFENDANTS**

### CLASS ACTION COMPLAINT

COMES NOW the Plaintiffs by and through counsel, **SUTTER & GILLHAM, P.L.L.C.;**
and, for this Class Action Complaint state:

### PRELIMINARY STATEMENT

1.     This Class action Complaint is brought on behalf of all providers who have
rendered services since March 1, 2019 as herein alleged.  HOME TO COMMUNITY LIVING,
INC., ("HCL"), is an Arkansas entity that has rendered services compensable through the
"Provider-Led Arkansas Shared Savings Entity" Managed Medicaid Program, ("PASSE"), but has
not been paid as owed.  HOME TO COMMUNITY LIVING, INC., is an Arkansas taxpayer.

2.     On March 1, 2019, the PASSE transition began after a hearing involving this matter
on February 27, 2019, in the case of <u>Arkansas Residential Assisted Living Assoc. v. Ark. DHS, et
al</u>, in Pulaski County Circuit Court Case No. 60CV-19-1021, 2nd Division, Hon. Judge Chris
Piazza. In <u>Ark. Residential</u>, the Court found that there was insufficient evidence to show that there

would be a failure of delivery of critical Medicaid services by the PASSEs or that irreparable harm would result from the initiation of Phase II. The first Phase of the program was preparatory for the start-up of Phase II. The initiation of the transition to Phase II of the "Provider-led Arkansas Shared Savings Entity" Managed Care Organizations takeover of Medicaid payments was in effect the actual start of the program. Phase II was allowed to proceed because DHS promised the system was ready. The Court's ruling considered testimony from witnesses for the Defendants that the PASSE entities were up and running, ready to assume their responsibilities, process claims correctly, had done test runs to confirm readiness, and that no irreparable damage due to abrupt discontinuance of care would occur. Time has not been kind to these false predictions. A catastrophic failure of major proportions began on day one and has interrupted care to tens of thousands of recipients and hundreds of providers on a state-wide scale. The collapse of systems and the cessation of benefits to even the most critical patients has become potentially life threatening and the resulting harm is much worse than even the worst imaginings of the original Plaintiffs' in Arkansas Residential. Some recipients and providers have received NO BENEFITS at all since March 1, 2019 without cause or due process, and this Plaintiff went unpaid for the entire month of March, missing payroll, hindering care, and impinging upon client health.

3.      The original Plaintiff in Arkansas Residential ("the Association") is an Arkansas non-profit organization that was founded in 1983 to provide advocacy, communication, education, and other resources to the Residential Care and Assisted Living industry and residents. It and fifteen (15) of its members sued the Department of Human Services Office of Long Term Care to enjoin initiation of Phase II. The Association is licensed to provide balanced meals and snacks, scheduled activities and events, Behavioral Health Management, beauty services, private and semiprivate rooms, laundry and housekeeping, certified Nursing Assistants, scheduled

2

transportation to medical appointments, and trained professional staff on duty twenty-four (24) hours per day in a residential setting. Its client base is different than that of the Plaintiffs herein who offer outpatient services, in-home services (Plaintiff HCL) or other non-inpatient, non-residential treatment.

4.     Potential intervening Plaintiffs in Ark. Residential, John Doe Medicaid Beneficiaries 1-10, are presumed to be primarily residential treatment Medicaid recipients and Intervenor-Plaintiff Jane Doe is currently an outpatient benefits recipient under Medicaid who has allegedly relapsed solely due to the breaches and violations by the PASSEs. These are individuals who have been, or should be, assigned to one of the PASSES, as described in more detail below. They have also been, and will continue to be, affected and damaged by systemic failures described and predicted in the original Complaint by the Association, and while they have no adequate remedy at law to ensure continued access to vital Medicaid services based upon the actions and inactions of the PASSEs, they have not requested class certification, do not directly represent non-inpatient, non-residential treatment providers, as does this Plaintiff, and that case has been held in abeyance for reasons inapplicable to these Plaintiffs herein and therefore this Class Action is necessary.

## PARTIES

5.     Defendant Arkansas Department of Human Services ("DHS") is Arkansas' largest state agency and serves more than 1.2 million Arkansans every year. The purpose of DHS is to ensure the citizens of Arkansas are healthy, safe, and enjoying a high quality of life. To manage the services and programs it provides, DHS has nine (9) divisions and seven (7) support offices headquartered in Little Rock, Arkansas, in addition to offices in every county in this state. While DHS may delegate certain delivery of services and management of benefits to Managed Care

3

Organizations ("MCOs"), such as the MCO Defendants herein, it cannot delegate its legal responsibility and it remains ultimately accountable to ensure the MCOs do not violate their responsibilities. DHS is liable for any failure of providing services committed by the delegatee MCOs under the federal Medicaid Act and federal regulations, (See 42 CFR 431.10(e), which prohibit delegation of discretionary powers to an MCO in administering the plan which remains under the ultimate control and responsibility of DHS. Violations of such regulations or other applicable laws by an MCO that deny a recipient's rights under government health care plans are a denial of due process redressable as a violation of plaintiffs' civil rights under the Civil Rights Act, state or federal. See *Shahknes v. Berlin*, 689 F.3d 244 (2d Cir. 2012). This Court's power to act in this case is consistent with Medicaid beneficiary due process rights under Medicaid, see 42 U.S.C. §1396a(a)(3) and generally *Goldberg v. Kelly 397 U.S, 254 (1970)*. The PASSE program appears to have been designed to circumvent these protections which is a violation of law and Plaintiffs' civil rights. The purpose seems to have been effectuate a Medicaid Benefits cut disguised as an organizational restructuring.

6.      Defendant Cindy Gillespie ("Gillespie") is the Director of the Arkansas Department of Human Services and is sued in her official capacity. Defendant Gillespie has the responsibility for implementation and oversight of the Provider-Led Arkansas Shared Savings Entity, the managed care system created by Act 775 of 2017 (codified at Ark. Code Ann. § 20-77-2701).

7.      Defendant Paula Stone ("Stone") is DHS Deputy Director, Innovation and Delivery System Reform, and is sued in her official capacity. Stone has the responsibility for implementation and oversight of the PASSE system.

8.      Defendant Summit Community Care ("Summit") a/k/a APC Passe, LLC is a PASSE entity known as a Managed Care Organization ("MCO") that has contracted with DHS to

4

manage a portion of the State Medicaid program where it is given millions of dollars of Medicaid funds each month to administer for DHS. The MCO administers these funds in a for-profit at-risk model similar to an insurance company. These plaintiffs allege that this defendant is in breach of its management contract with DHS and in violation of laws and regulations which it is obligated to follow and which it has agreed in its contract with DHS that it will follow. The violations of these laws and provisions constitute a violation of the plaintiffs' civil rights under the Arkansas Civil Rights Act under which an injunction is sought, but the right to seek damages is included and the right to amend the Complaint to state additional violations of law or legal theories, or to add as defendant its parent company Anthem, Inc. is hereby specifically reserved. All allegations against Summit are generally applicable to the other two MCOs against whom the same relief is sought with the same reservation of rights.

9.      Defendant Empower Health Solutions, LLC, hereinafter referred to as "Empower" (managed by Independent Case Management, Inc. and Beacon Health Options, Inc. and Statera, LLC and others) is a PASSE entity and MCO that has also contracted with DHS to manage a portion of the State Medicaid program in the same way as Summit. This plaintiff alleges that this defendant is also in breach of its management contract with DHS and in violation of laws and regulations which it is obligated to follow and which it has agreed in its contract with DHS that it will follow. The violations of these laws and provisions constitute a violation of the plaintiffs' civil rights under the Arkansas Civil Rights Act under which an injunction is sought, but the right to seek damages is included and the right to amend the Complaint to state additional violations of law or legal theories or add its related companies if required is hereby specifically reserved as is the case with the other MCO defendants.

10.    Defendant Arkansas Total Care, a division of Defendant Centene Corporation, is now the largest MCO in the country managing government funded health care for profit (no. 61 on Fortune's 100). Centene and Arkansas Total Care are the third MCO PASSE entity and both are named as Defendants herein. Centene has also contracted with DHS to manage a portion of the State Medicaid program in the same way as Summit and Empower. This plaintiff alleges that this defendant is also in breach of its management contract with DHS and in violation of laws and regulations which it is obligated to follow and which it has agreed in its contract with DHS that it will follow. The violations of these laws and provisions constitute a deprivation of the plaintiffs' property rights under the Arkansas Civil Rights Act under which an injunction is sought, but the right to seek damages is included and the right to amend the Complaint to add related entities or to state additional violations of law or legal theories is hereby specifically reserved as is the case with the other MCO defendants, to which these allegations also apply.

## JURISDICTION AND VENUE

11.    This is an action for a temporary restraining order, declaratory and injunctive relief and damages related to the recent and continuing implementation of significant detrimental changes to the Arkansas Medicaid Program as administered by DHS and delegated to the Defendant MCOs herein, as well as to recover damages from the private Defendants, which Plaintiffs reserve the right to more specifically identify as to specific amounts subject to proof. The amounts owed to this Plaintiff are shown by the documents in the Appendix attached hereto.

12.    Defendant, OPTUM SERVICES, INC. ("Optum"), a division of United Health Care, ("UHS"), is the MCO vendor chosen by DHS to manage the "Independent Assessment" system for the PASSEs. This assessment is supposed to be in person, individualized, based upon a medical records review, and evidence based and thorough under the contract. It is not. Optum

is using methods involving an impersonal, non-contact, inadequate medical history gathering (or none at all); and use of an invalid, one-size-fits none checklist to arbitrarily determine assigned tiers for each Medicaid beneficiary. As a result, critical services for Tier III individuals are now denied because some have been re-assigned by the PASSE system, and moved to a lower tier without adequate review by a qualified evaluator. As such Optum is also involved in the civil rights violation herein.

13.    Plaintiff herein, HCL as stated in Paragraph No. 1 above, is an Arkansas Medicaid provider, under PASSE, and belonging to a class of providers that includes providers of home-based, school-based, or clinic-based out-patient services. They have different rules and different payment criteria than residential facilities or hospitals and therefore the providers in Ark. Residential cannot adequately protect this class. Also, in-patient providers have other emergency sources of funds that these Plaintiffs herein do not. The threat of shut-down is more present.

14.    This Court has jurisdiction over the parties and subject matter of this case pursuant to Amendment 80, Sec. 6 of the Arkansas Constitution, Ark. Code Ann. § 16-13-201; and Arkansas Supreme Court Administrative Order 14, as well as other provision of federal and state law and has concurrent jurisdiction to interpret any federal regulations which defendants have contracted to follow. Recitation of some examples of these violations of law are included in an Appendix hereto which includes correspondence, showing the ineptitude of defendants and including spreadsheets proving breaches, delays, and non-payment.

15.    Venue is proper in this Court under Ark. Code Ann. § 16-60-104(3)(A).

## INTRODUCTION

16.    This case involves the concerted effort of Defendants to act unilaterally, against the best interests of the people of this state, to comprehensively, haphazardly, and most importantly

7

IRREVERSIBLY transform Medicaid, the cornerstone of the social safety net, in a way that has already harmed the health and welfare of the poorest and most vulnerable in the State. And it threatens to continue to do so. This transformation was sold to the people of this state as an "improved" version of managed Medicaid when in fact it was simply a program to cut the Medicaid budget of the State by identifying the approximate 45,000 sickest (and therefore most expensive) patients on Medicaid and force them in to a for-profit private-managed care model where benefits would be reduced by design. This was done through a very convoluted and hyper-complicated and highly bureaucratic private for-profit managed care enterprise rather than directly by DHS. The system was designed to be implemented in a way similar to what has been done in other states by MCOs like Centene, Arkansas Total Care's parent company, to guarantee an immediate savings to DHS (and profit to private entities like Centene). This is accomplished through an immediate cessation of regular payment of benefits upon the transition date, resulting in insolvency and shut down of over ¼ of the enrolled providers, and a resulting "drop-out" of a portion of the recipients by imposition of bureaucratic hurdles and blockades that some disabled and handicapped could never overcome. This is a random and arbitrary budget cut by intentional creation of "cracks" in the safety net for some to fall through and from which to never fully recover. Direct cuts to benefits being politically untenable, the new PASSE system accomplishes the same cuts through a delegation to a private, non-functional delivery system that allows "plausible deniability" to the state government affiliated Defendants who falsely promised the PASSEs were not a change in benefits but only a change in delivery method. The past history of what has happened in other states where this model has been implemented (by MCOs like UHS, Centene, etc.) is prologue for the current foreseeable disaster.

17.     The Medicaid program under the jurisdiction of the U.S. Department of Health and Human Services ("HHS"), provides health insurance coverage to more than 75 million low-income people in the United States and hundreds of thousands of chronically ill in this state. Medicaid enables states to provide a range of federally specified preventative, acute, and long-term health care services to individuals whose income and resources are insufficient to meet the costs of necessary medical services. The core populations covered by Medicaid include children; pregnant women; the aged, blind or disabled; and adults with household incomes of less than 133% of the federal poverty level (currently $12,140 for an individual in Arkansas). Prior to the PASSE system, over one million Arkansas residents relied upon Medicaid coverage, either directly or indirectly.

18.     When Arkansas chose to participate in the federal Medicaid program, it agreed to follow all of the federal Medicaid requirements, including those regarding the scope of coverage and eligibility for the program. Federal law, incorporated into the MCO contracts to govern the ratio of MCO revenue compared to benefits paid out to beneficiaries (which limits MCO profit and thereby deters wrongful claim denials). The State of Arkansas may not impose additional eligibility requirements other than those set forth in the Medicaid Act, and Arkansas cannot pick and choose among individuals within a covered population group to discriminate against the disabled or infirm, and yet the Defendant MCOs and DHS have done exactly that to save money and to profit at our expense.

19.     The PASSE system is supposed to be a model of organized care created by Act 775 of 2017. "Provider-led" is a misnomer as real control and the profits go to the parent companies (51% owners) like Defendant Centene, who control the operator through contracts with their own subsidiary for consulting or management services at lucrative rates. There is also a use of belated

9

"claw-back" audits to manipulate the Medicaid loss ratio and / administrative loss ratio, after-the-fact for maximum profit. The PASSE system is a fully funded Medicaid program that went "live" with what was promised to be full implementation (referred to as "Phase II") on March 1, 2019. However, as this Complaint demonstrates, and as feared, the system crashed upon implementation in spite of implementation being delayed from January 1, 2019 to March 1, 2019. DHS and the PASSEs had the duty to ensure PASSE system stability and they knew they were not ready, willing, or able to perform, on March 1, 2019.

20.    Arkansas healthcare providers, these Plaintiffs, members of the class to which HCL belongs. and the Plaintiffs in Ark. Residential, and even some PASSE executives warned about the coming catastrophe with the PASSE system. They warned the harm to Medicaid beneficiaries, and the need to postpone full implementation of the PASSE system until such time as the system was fully prepared and functional and until DHS could enforce proper compliance by the MCOs. The failure of the PASSES so far has been so serious that providers have shut down, pharmacies have stopped filling Medicaid prescriptions (Walgreens) and at least one PASSE opted to exit the system rather than continue to participate in the flawed implementation. The PASSEs are required to pay even those out of network whatever is the out-of-network rate, unlike in some private ERISA plans, and yet these payments are being denied as well.

21.    Gillespie and DHS have been informed by providers, and various other stakeholders of the life-threatening collapse of the claims payment and eligibility determinations process and yet have done nothing of substance but to deny the existence of this collapse. They were literally grilled by the Arkansas legislative committee members and had no answers but doubletalk. The closing of unpaid providers will have a direct and immediate effect on providers and Medicaid beneficiaries' ability to provide and receive services. Calls to DHS go unanswered,

or when someone is reached, the provider is told that DHS employees have been told to "stay out of it" and refer all complaints back to the MCO who is the complaintee. This is an abdication of responsibility. DHS enforcement staff has been reduced which makes the required supervision harder, assuming there even is a desire to enforce. Also, local CEO's and administrators of the subsidiary powerless and without authority. All claims and profit-impacting decisions are made at the headquarters of the parent companies out of state (Minnesota, Missouri, etc.). These defendants, in other states, have a subsidiary local company. The CEO's of these local subsidiaries have, at times, expressed frustration that all power resides with "bean-counters" at the national level. Such CEOs have then, sometimes, been "retired" with benefits and non-disclosure agreements.

22.    Defendants' refusal to continue to pay for and provide Medicaid services that were routine before March 1, 2019 has had an immediate harmful impact and will cost the health and lives of Arkansas citizens. This obtuse malfeasance is an action beyond and against the agency's constitutional duties, *ultra vires*, arbitrary, capricious, and in bad faith, and is being accomplished with the assistance of all other Defendants. Furthermore, the PASSE Defendants are in violation of law, independently, and may be sued directly even if DHS does not force them to comply.

23.    These Plaintiffs therefore seek expedited relief by issuance of a temporary injunction enjoining Defendants from denying any treatment that was in effect and approved and being paid routinely by Medicaid prior to March 1, 2019 and to continue any such payments and treatments until re-evaluation of the entire program at least 90 days hence. The original request to defer Phase II for such a period was not granted which resulted in clean valid claims being denied en masse due to system unreadiness. Since the system cannot handle the claims processing duties properly, the default position should be to pay all claims that were previously approved and being

11

paid instead of denying them all as is now done. The MCOs have been paid tens of millions of dollars, at least 85% of which they hold in trust for the Medicaid beneficiaries of this state by law. They are holding this money rather than passing it through since March 1, 2019. DHS should be enjoined from any further advances to the MCOs until they begin paying claims properly. Medical care needed immediately cannot be held in escrow or bear interest as though it were a monetary investment. Critical Care delayed and denied costs lives.

## FACTUAL ALLEGATIONS

### I. The PASSE System.

#### A. Purpose and General Structure

24.     DHS created the PASSE system as a new mechanism for Medicaid service provision to certain Arkansans with qualifying development disabilities ("DDs"), behavioral health diagnoses ("BH"), or other "significant" needs.

25.     DHS claimed that the PASSE system was created not to cut benefits or save money but to improve the health of Arkansas who need specialized care for behavioral health issues or developmental/intellectual disabilities. However, this specialized care was already being provided until March 1, 2019. DHS claimed the PASSE entities would link providers of physical health care with specialty providers of behavioral health and developmental/intellectual disabilities services; but in reality the result has been to transfer the most disabled Medicaid patients' care from those specialists to Family Medicine providers to save money. DHS proclaimed the need for the PASSEs to coordinate care for all community-based services for these individuals; but agencies like the Plaintiffs in Ark. Residential herein and this Plaintiff HCL (and other community-based providers) were already adequately doing that until the PASSEs stopped paying them. To allow flexibility in the types of services offered, DHS said the PASSEs would increase the number of service

providers available in the community to serve the PASSE members when this was untrue. Providers are going unpaid and are dropping out. The actual goal was to cut the Medicaid program by reducing the number of providers by at least 25% by restricting claims payments to them upon transition until some cannot survive. In fact, Centene, the parent company of PASSE member Arkansas Total Care ("ATC"), has reduced payments or reduced providers in every state that it has replaced Medicaid. Its managers in other states have at times slipped and admitted this publicly, after which they were terminated as previously alleged. DHS must or should have known Centene's history, or perhaps did and enrolled subsidiary ATC for that reason. DHS at least admitted its desire to reduce costs of care. DHS claimed to accomplish this by coordinating and providing appropriate and preventative care which is code for transferring care from behavioral specialists to primary care providers (PCPs).

26.    Already the PASSEs have reduced the number of providers. Each PASSE is Medicaid-funded and is given tens of millions of dollars, and 15% of the government funds given are theirs to keep. The 85% to be paid out for Medicaid claims is referred to as the Medicaid Loss Ratio ("MLR"). Each beneficiary is supposed to be assigned to one of the three PASSEs. Providers can contract with the PASSEs to be in its "network," and the PASSE is supposed to pay providers for the healthcare services rendered to its members whether or not in network under the Medicaid Act but this is not being done. Some out of network providers, especially pharmacies, are receiving nothing.

27.    The PASSEs are also responsible for overall care coordination for its members. Over 45,000 Arkansans were transferred to the PASSEs, including about 7,500 individuals on DD (disabled) Waivers and over 38,000 individuals with behavioral health diagnoses with significant

needs; plus, about 800 people who were in private Intermediate Care Facilities before March 1, 2019.

28.    According to DHS, the PASSE system is not intended to change a person's eligibility for Medicaid or the benefits they receive but change only the way services are paid for; but this is clearly not the case as thousands of these beneficiaries have been arbitrarily disqualified by PASSE. Immediately upon transition thousands of patients were no longer "found" to be on the Medicaid rolls. Several of the HCL claims were denied for this reason when beneficiaries who had been long-time recipients were claimed denied as not enrolled. See Appendix documents. Also, as has happened in other states, the portals were not ready, so paper claims had to be used, and these paper claims are then miss-handled by the MCO. This delays payment for weeks.

29.    One of the ways MCOs taking over management of Medicaid programs can game the system is to take advantage of the transition period to eliminate providers by non-payment to them until they close down. Most providers have margins of less than 5% and no reserves due to already low Medicaid rates. One of the ways Centene has operated in other states is to create new bureaucratic requirements for providers but to not inform them prior to the transition date. Then when claims begin being filed with the MCO under the new system, the provider finds all of the claims denied, sometimes for months. Excuses for non-payment that Centene has used from state to state, and now in Arkansas, is to deny all payments to providers for not having signed their contract with the MCO by the start date. But the MCO does not even send them their contract, or tell them there is one to be signed, until after it is used as an excuse to deny the initial clean claims. Typically, providers are told something like "we forgot to send out the contracts, so that is why your claims will be denied until we can process your contract in 45 to 60 days." Providers usually object and say they already signed their contract, but in such cases the MCO explains that this

14

previous contract document was just a letter of intent (LOI). This routine has occurred in state after state with MCOs like Defendant Centene and others misleading providers and "neglecting" to send out providers' contracts timely, resulting in providers closing during the transition period and the MCO keeping the money owed to that closed provider. Belated payments are just as harmful if they lead to providers closing. The MCOs have used this unannounced contract requirement to deny provider claims again here in Arkansas. If this was a mere oversight Centene and the other MCO's would not have repeated such mistake.

30.     Also, other schemes to deny claims initially to reduce the number of providers is to have "portal problems" with computer claims processing which requires the use of paper claims which are invariably not received or "found" later in the mailroom, or "sent to the wrong address" even when sent to the claims address provided on the websites. All of these excuses have been used to deny HCL and other members millions of dollars since March 1, 2019.

31.     The PASSE entities did not exist before the passage of Act 775 of 2017 and have never before managed any health care services needed by the citizens of Arkansas, let alone crucial DD and BH services, but the parent companies are large MCOs with expertise. For example, Arkansas Total Care is really a division of Centene, a Fortune 100 Company that has experienced these same "mistakes" in state after state where it takes over. The local personnel of the entities have no prior coordination of care or reimbursement infrastructure on which to rely so clearly they are relying on parent company infrastructure or independent professionals hired by those parent companies, empower claims are handled in Minnesota for example. The PASSE MCOs should be enjoined from paying any money to the parent companies, whether they be management fees, consult fees, profit distributions, alleged services proved by contract or otherwise, until the MCOs perform properly.

15

**B. The PASSE Model**

32.     Originally, there were five (5) PASSEs.   However, one PASSE, Arkansas Advanced Care, pulled out from the PASSE model last year.

33.     The remaining four (4) PASSEs Forever Care, Arkansas Total Care, Empower Healthcare Solutions, and Summit Community Care – provided limited care coordination for clients during 2018 in preparatory "Phase I" of the PASSE system implementation.

34.     The PASSEs were set to enter "Phase II," which was full-risk, care coordination, and reimbursement on January 1, 2019. "Full-risk" under Medicaid regulations as enforced by CMS (Center for Medicaid Services, a division of HHS) means that DHS turns over nearly all the Medicaid funds it has for its services to private companies to pay the beneficiaries' claims in exchange for 15% of the funds going to the MCO for its cut. This requirement of a split of 85/15 is engraved in the Medicaid Act and CMS regulations under what is called the Medical Loss Ratio (the 85%) and the Administrative Ratio (the 15%). The money paid to the MCO is based upon the number of members the MCO is assigned times the per month per member rate paid for each one by DHS from Medicaid funds from the government. That rate is supposed to be figured on an actuarial sound basis. If, for example, the rate is $250 on average, and 40,000 members are assigned to PASSE, then the MCOs would get paid $10,000,000 per month resulting in $1,500,000 profit each month to MCO companies. This explains the eagerness of the MCOs not to delay even if they were not ready. However, due to a lack of system preparation, and concerns voiced by various providers, stakeholders, and employees of the PASSEs themselves, Phase II was delayed until March 1, 2019.  On January 18, 2019, approximately six (6) weeks before Phase II was to begin, DHS made a public announcement that ForeverCare had made a "business decision" to pull out of the current PASSE model. ForeverCare apparently was not willing to assume responsibility

for a plan doomed to fail and compromise public health. The MCOs are being paid millions of dollars and the State has not received that for which it paid.

35.     DHS, either at the hearing in this case or in public statements, stated that the system had been tested, and that billing systems would function seamlessly, provide additional enrollment opportunities for providers, and continue care without interruption; all of this was false.

36.     DHS stated that providers had been fully informed in order to comply and continue to be paid. This was totally false, so why was the statement made? Beneficiaries supposedly had their new enrollment in place and had received their cards. In fact, many beneficiaries have still not been placed on the roles of their PASSE and their claims denied on the grounds they are not members. This has happened to the Jane Doe and John Doe Plaintiffs in Ark. Residential.

37.     Mike McCabe, the president of the ForeverCare, told the members of ForeverCare in an e-mail on January 16, 2018: "Despite our best efforts we do not have the systems in place to assure members would be cared for in the way they deserve. In addition, the risks posed by the continuing questions around the program are too great for us to move forward at this time." The current situation makes these comments appear prophetic. It is unfortunate that these ethics did not result in equally honest disclosures from the other MCOs.

38.     Further, in an email to Defendant Stone and others, McCabe wrote ForeverCare "reached this decision with much reluctance in light of the March 1, 2019 implementation date." McCabe continued: "As we have discussed, in addition to the fact that ForeverCare's internal requirements dictate that it cannot enter into Phase II Agreement unless the start date of Phase II is moved to July 1, 2019, we believe there are also program operational issues which need to be resolved before DHS implements Phase II."

17

39.     McCabe advised Defendants that ForeverCare could continue to participate in the PASSE model if its participation in full risk was moved to July 1, 2019.   ForeverCare would have been paid hundreds of dollars per month for each member assigned to them; this amounts to millions of dollars per month.   ForeverCare forwent this money rather than lie and claim to be ready when in truth no one was ready.

40.     Defendants DHS and the individual Defendants have publicly denied any operational issues with the PASSE model in spite of their awareness of these problems. Defendants went forward with March 1, 2019 implementation, even though the PASSE system was unprepared to enter Phase II.   It seems logical to assume that the motives of all Defendants, including the MCOs, were financial, or political, rather than improvement of care, since the results of their actions were a collapse of the Medicaid payment system, at least so far, and lower costs through such cuts, and more money for MCOs.

41.     This explains why McCabe was ignored and why DHS has allowed this to continue under political pressure to "get it done".

## II. Areas of Instability within the PASSE System

### A. Member Attribution and Reattribution

42.     ForeverCare's 7,600 members were to be reassigned to a new PASSE and yet many are not getting benefits.

43.     Many ForeverCare clients have not been listed with a new MCO and their claims have been denied with the explanation "member not found."   There appears to be no procedure in place to direct this process, notify providers as to when a beneficiary transfers from one PASSE to another, or alert providers as to when (and how) to transition billing between PASSE's when a member switches MCOs.   Many of these PASSEs show no record of these members being

transferred to them. It is illegal for DHS to stop care without notice by transferring the beneficiary, before the entity to which care is transferred is functional.

44.    Many beneficiary membership cards have still not been mailed out and it is April. These beneficiaries without membership cards have been left out.

45.    Providers and beneficiaries who are unable to receive and provide needed services because there is still a lack of clarity around member attribution and transfers now suffer irreparable and continuing injury for which there is no adequate remedy at law.

**B. Beneficiary Assessments**

46.    If a beneficiary receives Medicaid and has been identified as needing Behavioral Health services, receiving DD services through a waiver, or is on a waiver waitlist, then DHS requires an independent assessment ("Assessment"). The PASSE and DHS are requiring all new assessments upon transition.

47.    DHS has contracted with Optum to provide these Assessments. Optum is a United Health Care company. United has been found liable in Federal Court in the Middle District of California last month of using improper definitions or methods of what constitutes medical necessity when making these assessments to deny care to the needed. These procedures were established by United's upper management and employed, nationwide, and now in Arkansas. Their procedures have not been rehabilitated since the judgment against DHS/Optum in Federal Court in California.

48.    The prior Assessment process included a review of medical records by a registered nurse and significant time spent with the beneficiary to accurately evaluate the beneficiary's needs. The Optum Assessment includes none of these important aspects and is ever more inadequate than the illegal process UHS employed in California.

19

49. Optum is supposed to perform the assessments in-person at the facility where the beneficiary receives services, a school, or the beneficiary's home. Optum has been performing many of these Assessments by telephone, or not at all, a clear violation.

50. Even those Assessments performed in-person by Optum consist only of asking the beneficiary questions that require a Yes or No or a few word answer from a standard check list. DHS and UHS know this is an invalid (though very cheap) assessment method. Optum does not review the relevant medical records nor does Optum spend quality time with the beneficiary. This means Optum is asking beneficiaries (with schizophrenia, Bipolar, dementia, mutism, low IQ, brain damage, and developmental disorders) assessment questions that form the only basis for tier assignment and eligibility for benefits. This process is deficient and results in inaccurate Assessments. Claims for payment by Optum/UHS or MCOs based upon those false assessments would constitute false claims under the law, just as the payment to the MCOs by DHS upon false claims of readiness constitute false claims.

51. For example, Optum may ask a beneficiary if he or she needs help showering or some other activity of daily living ("ADL"). The beneficiary may respond no out of embarrassment. Optum does not follow-up with more specific inquiries as to the ADL in question, review additional records or talk with family, staff at the facility, or the mental health clinic staff to evaluate whether the beneficiary's response is accurate. Optum makes no inquiry as to whether the beneficiary can enter the shower without physical help but requires a prompt to shower, a prompt to use shampoo, a prompt to use body soap, a prompt to dry off fully, and prompt to put on clean clothes, or clothes at all, all of which is necessary for the autistic, schizophrenic, developmentally disabled, or acutely depressed (which is the exact population covered by the PASSE).

52.    At the end of Optum's Assessment, the beneficiary's answers are scored, with each answer being worth a certain number of points.   Based on the total number of points, the beneficiary is assigned to the corresponding level ("Tier") to-wit; no tier, Tier 1, Tier 2, or Tier 3. This point system is invalid as the sole tool and under-evaluates the disability or disorder the beneficiary has and therefore provides lesser care than "medically necessary" in violation of law. Chronically mentally ill or disabled patients are being re-assigned to lower tier levels than previously assessed. This seems to be the intended result, to lower the tier assessed in order to reduce services to save costs.   There is no other explanation for DHS changing from an accurate assessment method, that in the long run cost no more than what Optum is being paid for invalid assessments which are inaccurate.   If a physician were to diagnose patients or triage in this manner, the result would be malpractice and loss of license.

53.    The Tier into which a beneficiary is placed determines what services the beneficiary can receive.   Lower tiering is in effect a cut in Medicaid services disguised as a re-assessment by reducing what is determined to be "medically necessary treatment".   The patient has not improved. The invalid assessment just says he has, so he gets less treatment even though this is not medically justified.

54.    Tier 1 means that the beneficiary can receive counseling services and medication management.   Beneficiaries categorized into Tier 1 are not assigned to a PASSE but to a family practice doctor for care on the theory that their mental health condition is mild.   Usually they get no counseling at all.   Beneficiaries in a Tier 1 level are required to have their needs met through such PCP outpatient clinic-based services, usually without mental health professionals.

55.    Tier 2 means that a beneficiary is eligible for target services provided in home and community setting in addition to counseling. Beneficiaries categorized into Tier 2 are assigned to a PASSE.

56.    Tier 3 means that a beneficiary is eligible for all of Tier 2 services and may need services provided in a residential setting. Only in this Tier 3 is a beneficiary eligible for inpatient residential care. Beneficiaries categorized into Tier 3 are assigned to a PASSE.

57.    Once the assessment is completed by Optum, the beneficiary receives the results.

58.    The dangers of this shorthanded method by Optum are to cut benefits and lower care by an invalid point system instead of the patient's actual medical needs. Optum has been recently implicated in lawsuits for underassessment of what constitutes how to define medically necessary treatment and assess for it as previously mentioned above.

59.    Upon information and belief, many beneficiaries who were previously identified as requiring Tier 2 or Tier 3 services are now suddenly being assessed as meeting Tier 0 (not eligible for services) or Tier 1 (eligible for reduced services) based on Optum's deficient Assessments. Tier 0 and Tier 1 beneficiaries are not assigned to a PASSE. This can be a life-threatening event when Tier 3 patients are denied care when assessed below their appropriate level. One example of the danger of this involved a patient in Louisiana's MCO program (in which Centene is involved) who was restricted to Tier 2, despite clear reports of suicidality, and recent inpatient protective custody for same. His daily service needs were under-measured by invalid means to once weekly; he relapsed, committed suicide and died in his bedroom closet at age 12. The risk of this would have been avoided by continued daily contact under an accurate evaluation at Tier 3. His care denial and lowered tier were on "emergency appeal" a week at the time of his death. The threat is real.

60.     Providers providing services and residential facilities to these beneficiaries previously identified as requiring Tier 2 or Tier 3 services, who have now been identified as non-Tiered or Tier-1 beneficiaries, are faced with having to remove beneficiaries in need of vital services from their programs, due to the inability to provide such care without any expectation of compensation for the services.

61.     Many beneficiaries no longer qualify for the services they need as of March 1, 2019 because the MCOs changed the rules to lower their tier. The PASSE program was intended as a vehicle to cut the Medicaid program without acknowledging it.

62.     Neither DHS nor the PASSEs have any plan for these beneficiaries as to how they will be able to continue receiving the services they need, or what they should do now that they have been cut off. The legislative has conducted hearings and berated defendants but the real decision makers, the CEO's of the parent companies are not directly answerable to anyone, certainly not to DHS or their lower ranking local subsidiaries.

63.     In spite of promises of honoring previous authorizations for treatment, neither DHS nor the PASSEs have an answer for residential patients who have been cut off.

64.     Pleading further, it is unclear as of this date of who will be responsible for overseeing the Optum Assessment process in the future or how to make it accurate.

65.     Optum has declined to conduct some prior authorization assessments of beneficiaries residing in Residential Care Facilities. Optum has attempted to conduct some prior authorization assessments of beneficiaries via telephone while being paid for its personal evaluations. This will result in arbitrary assessments.

66.     According to DHS's documents, it has no plan.

23

67.     Providers and beneficiaries unable to receive and provide needed services because of a deficient Assessment, referral, and renewal process and the lack of clarity around these processes as of March 1, 2019, are suffering irreparable and continuing injury for which there will be no adequate remedy at law.

### C. Provider Contracts/Billing

68.     According to DHS, each PASSE is responsible for contracting directly with providers. These contracts provide the key terms applicable to the relationship between a provider and a PASSE, including billing requirements and reimbursement rates. However, as described above, these contracts were not timely provided to all providers, and providers have not been timely paid. The Provider Class herein consists of all providers who have provided services under the PASSE system since March 1, 2019. They treat the beneficiaries who should be receiving benefits since March 1, 2019, but are not.

69.     HCL and others similarly situated have been told by some PASSEs that they will have to wait 45 to 60 days until their contract is approved and they can then be paid.

70.     In addition, the PASSEs are wholly dysfunctional with regards to billing. The PASSEs have admitted the claims process has problems and that payments will be delayed for months, due to no fault of Plaintiffs.

71.     Some of the portals are still not functioning yet. The PASSE billing employers are untrained regarding the mechanics of billing under the Arkansas PASSE billing system and give conflicting instructions because they handle claims from many different programs in different states. Portal problems by these MCOs in other states were concealed when other excuses were offered for non-payment (lost claim form, etc.).

72.     Beneficiaries report their care coordinators can't answer their questions regarding why their services are being denied and what to do about it. They confess they have no power. Even when the MCO's local CEO personally contacted this Plaintiff, only 1/3 of the claims pending were paid because the parent company's claims department does not take orders from her.

73.     When asked whether Walgreen's Pharmacy or Fred's were in-network no one at the PASSEs could answer the question or direct Plaintiffs to anyone who could, and pharmacy claims were illegally denied.

74.     As a result, none of the Plaintiffs or class members can correct the mistakes and non-payments by the MCOs by appealing to the MCOs themselves. This has been futile, and parent Fortune 100 Insurance Companies are bureaucratically unresponsive and unavailable.

75.     Providers and beneficiaries who are unable to receive and provide needed services because of the lack of clarity around billing and reimbursement are suffering irreparable and continuing injury for which there will be no adequate remedy at law.

**D. Appeal Rights**

76.     In the Medicaid system before PASSE, the rights of providers and beneficiaries to appeal decisions regarding payment of Medicaid funds were written in various places such as the Arkansas Medicaid Providers' Manual and the Arkansas Medicaid Fairness Act, Ark. Code Ann. § 20-77-1701, et. seq.

77.     However, now the appeal process will transition to one in which the individual PASSEs have the ability to create and utilize their own, individual, internal appeal procedures, and currently they have no workable appeal procedures. The MCOs cannot even explain their own appeal rules or who are the personnel assigned to such appeals. Plaintiff has been unable to speak with anyone at the PASSE or MCO who actually decides works on appeals. Her assigned case

coordinator pleads helplessness and says there is no appeals person with whom she can speak. "They don't talk to claimants." This further stresses these providers and patients.

78.     Such an arrangement strips existing due process rights from providers and beneficiaries and creates significant barriers to access to the judicial system in cases initiated within these new virtually non-existent appeal processes.  This fosters confusion amongst providers and beneficiaries.  The MCOs will no doubt allege failure to exhaust administrative remedies upon legal action for not completing an appeal, when in truth, no real appeal process is available.  The Medicaid Act gives DHS ultimate claim authority but they refuse to enforce it.

79.     Neither DHS nor the PASSEs have provided any answers as to these problems.

80.     Providers like the Plaintiff who are unable to receive payment for needed services will suffer irreparable harm and may have to close.  Partial payments 6 weeks late will not suffice. (See Appendix).

## CLASS ACTION ALLEGATIONS

81.     The proposed Class is defined as all non-residential or non-inpatient providers who have rendered compensable services under the PASSE program since March 1, 2019.  Patients have attempted to intervene in Ark. Residential, and such is pending.

82.     The number of providers is estimated to be hundreds.

83.     Plaintiff's claims are typical of the Class and there are common issues.  Some of these issues include whether the providers have been timely paid in accordance with their agreements, which agreements are uniform and standard in their requirements for timely payment with regard to out-patient or home-based services.

84.     A class action is superior way to adjudicate this issue because the common issues predominate over individual issues, since the claims are not being paid because the private entities

lack the infrastructure to process claims and common excuses are being used for all wrongful claim denials.

85.    Plaintiff and its counsel are adequate to represent the Class, so this matter should be certified under Rule 23(b)(1) and (2).

## COUNT I

86.    Plaintiffs bring this Count against all Defendants, incorporate by reference into this paragraph all allegations set forth above in this Complaint, and any other allegations subsequently made by any other Plaintiff herein, if any.

87.    Arkansas Rule of Civil Procedure 65(a)(1) states that a preliminary injunction may be granted where it appears that irreparable harm may result to the Plaintiffs, if the preliminary injunction is not granted.

88.    Concurrent with the filing of this Complaint, copies have been provided to the parties and their attorneys pursuant to Ark. R. Civ. P. 65(b)(1)(B), and the additional Defendant MCOs and Optum/UHS through their registered agent for service, the Corporation Company.

89.    It is within the Court's discretion whether to grant a preliminary injunction. *Custom Microsystems, Inc. v. Blake*, 344 Ark. 536, 540, 42 S.W.3d 453, 456 (2001); *Smith v. American Trucking Association, Inc.*, 300 Ark. 594, 781 S.W.2d 3 (1989). The standard for issuance of a preliminary injunction consists of four elements that must be considered: (1) the probability of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest. *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 112-114 (8th Cir. 1981). The two critical factors are whether a plaintiff demonstrates a likelihood of success on the merits and whether the Plaintiff demonstrates a likelihood that, absent the

granting of preliminary relief, irreparable harm will occur. *Custom Microsystems*, 344 Ark. at 542, 42 S.W.3d at 456-57. The phrase "likelihood of success on the merits" has been interrupted by the Arkansas Supreme Court to mean a reasonable probability of success as to some part of the case. *Id.* at 542, 42 S.W.3d at 457.

90.     This inability to provide and receive services will result in irreparable and continuing injury for Plaintiffs and the Medicaid beneficiaries they serve for which there will be no adequate remedy at law. No class has been requested and certified in this subject mater.

91.     All Defendants have a duty to Plaintiffs and the class to which they belong to ensure the continuation of the Medicaid program without arbitrary reduction or cessation. All Defendants are state actors as that term is defined by law as private insurance companies discharging a public duty (Medicaid) for DHS by contract. This Court must act now to protect these vulnerable Plaintiffs.

92.     Plaintiffs thus request that this Court enter a declaratory judgment finding that the PASSE system, as administered by DHS, is unprepared and dysfunctional to adequately provide services to Medicaid beneficiaries in this State, and that the Defendants be ordered to pay all claims and approve all treatments that were routinely being paid prior to March 1, 2019 for a period of time until Defendants can demonstrate they have corrected these deficiencies. It is further requested Defendants be restrained and enjoined from changing prior Tier assignments, or reducing or cutting benefits until they are fully prepared to function as intended including evidence that (a) Medicaid beneficiaries have received and understand how to use, their PASSE membership cards, (b) that PASSE operating systems, phone systems, and billing systems are functional, that the MCOs have trained their employees as to how to do their jobs in a way not transgressing the rules or providers or beneficiaries right; and (c) that no tier re-assignment occur until valid

assessment procedures are established, and that no re-definition of medical necessity by imposed by the MCO's without DHS approval after a public hearing and a clear, written, complete definition thereof.

93.     The MCOs must also be required to have due process appeals to meet their contract which requires same. DHS must have due process appeals so non-due process appeals cannot be created by a delegate. Also, these Plaintiffs request attorneys' fee and costs and that a hearing be set as soon as possible on these issues. Finally, the Court should freeze any further payments to the PASSEs by DHS until they have met their obligations to pay claims, and to order a refund of the excess money 85% held in trust for beneficiaries which the MCO's have kept the past two (2) months by MCOs not paying as the law requires.

## COUNT II

94.     Plaintiffs bring this Count against the private Defendants and incorporate by reference into this paragraph all allegations set forth above in this Complaint.

95.     Plaintiff and the Class have provided services to the citizens of this State for which they should be paid, but the private Defendants refuse to pay for no valid legal reason. The named Plaintiff alone is owed tens of thousands of dollars, and damages continue to accrue. (See Appendix).

96.     Plaintiff has demanded payment, but the private Defendants refuse or delay to pay what is owed without legal justification.

97.     However, in breach of contract, the private entities have failed to pay Plaintiff and the Class. Plaintiff was delayed by fault of the PASSEs in obtaining a fully executed contract, but reasonably relied upon the Defendants promises of no disruption and continued to provide services. But Defendant breached these promises and has been unjustly enriched.

98.     Accordingly, Plaintiff and the Class are entitled to judgment against the private entities for appropriate compensatory damages and pre-judgment interest, and attorneys' fees and costs.

## COUNT III

99.     Plaintiffs bring this Count against all Defendants and incorporate by reference into this paragraph all allegations set forth above in this Complaint.

100.    Plaintiff is an Arkansas taxpayer and was so at all times relevant herein.

101.    The private Defendants have been paid by the State of Arkansas for services it did not perform, thereby constituting an illegal exaction which has unjustly enriched the defendant.

102.    Thus, there has been a waste of public money, and Defendants should be MCOs enjoined from expending any Medicaid money except to claimants until the private Defendants can render the services promised under the contract, and the private Defendants should be ordered to disgorge any public money they have received since March 1, 2019 until they perform the requested services, to all beneficiaries and pay all valid claims owed to providers and those entitled. In additional to the above three (3) counts, Plaintiffs reserve the right to amend to sue for other violations which time does not allow here, including, but not limited to, violations of: The Americans with Disabilities Act, the Rehabilitation Act of 1973, the Medicaid Act, violation of the Federal Medicaid Prompt Payment Regulation, the Parity Act, the Medicaid Medical Loss Rate Rule, or any other similar legal provision under state law or incorporated by reference into the MCOs contract with DHS.

**WHEREFORE,** Plaintiff(s) prays for appropriate Declaratory and Injunctive relief against all Defendants and for appropriate compensatory and punitive damages exceeding ten million dollars against the private Defendants, the right to amend, for costs, reasonable attorneys' fees, prejudgment interest, and trial by jury.

Respectfully Submitted,

**SUTTER & GILLHAM, P.L.L.C.**
310 West Conway Street
Benton, Arkansas 72015
501/315-1910 - Office
501/315-1916 - Facsimile
Attorneys for the Plaintiff

_____
Luther Oneal Sutter, ARBN 95031
Luther.sutterlaw@gmail.com

_____
Lucien R. Gillham, ARBN 99199
Lucien.gillham@gmail.com

31